CITIZENS FEDERAL BANK, A Federal Savings Bank, et al., Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 92–656 C.

United States Court of Federal Claims.

June 30, 2005.

---

Charles J. Cooper, Cooper & Kirk, PLLC, Washington, D.C. for plaintiffs. David H. Thompson, Elisebeth Collins Cook, Cooper & Kirk, PLLC, Washington, D.C. of counsel.

Delisa M. Sanchez, Trial Attorney, William F. Ryan, Assistant Director, Jeanne E. Davidson, Deputy Director, David M. Cohen, Director, Stuart E. Schiffer, Deputy Assistant Attorney General, United States Department of Justice, Washington, D.C. for defendant. Delfa Castillo, David C. Hoffman, Elizabeth Hosford, Lee M. Straus, John J. Todor, Trial Attorneys, United States Department of Justice, Washington, D.C. of counsel.

## OPINION AND ORDER

GEORGE W. MILLER, Judge.

This *Winstar*-related case is before the Court after a trial held between October 18 and October 27, 2004. United States Court of Federal Claims Rule ("RCFC") 52(a) governs "actions tried upon the facts," and provides that findings of fact may be "based on oral or documentary evidence ... and due regard shall be given to the opportunity of the trial court to judge of [sic] the credibility of the witness." RCFC 52(a). The Court heard testimony from seven witnesses: Charles B. Stuzin, former Chairman of Citizens Federal Bank, F.S.B. ("Citizens"); Alfred R. Camner, a partner at Stuzin and Camner, who was counsel to Citizens and various other financial institutions in South Florida; Clifford A. Hope, Citizens's chief accounting officer from 1985 through January 1996; Professor Christopher James, an expert in corporate finance, corporate financial policy as it pertains to the operation of financial institutions, commercial banks and savings and loans, and bank and thrift regulatory matters; Professor Randall Kroszner, an expert in economics, corporate finance, financial institutions, financial markets and the economics of the regulation of financial institutions in financial markets; David A. Kennedy, an expert in general accounting, accounting for business combinations and financial institutions; and Jean Rankin, a former Government regulator who worked for the Federal Reserve Bank of Atlanta, Federal Home Loan Bank of Atlanta, and Office of Thrift Supervision ("OTS"). As a threshold matter, while Mr. Stuzin and Mr. Camner have a financial interest in the outcome of the case, the Court found them both to be credible witnesses.

## BACKGROUND

### I. CITIZENS'S OPERATIONS PRIOR TO FIRREA

Citizens was a wholly owned subsidiary of CSF Holdings, Inc. ("CSF Holdings" or "parent"), a savings and loan holding company. Citizens was a savings bank chartered by the Federal Government. It was the principal subsidiary of CSF Holdings. Both Citizens and CSF Holdings are plaintiffs. The savings accounts of Citizens's depositors were insured by the Federal Savings and Loan Insurance Corporation ("FSLIC") prior to the enactment of FIRREA, and by the Federal Deposit Insurance Corporation ("FDIC") after FIRREA. Prior to FIRREA, Citizens was regulated by the Federal Home Loan Bank Board ("FHLBB" or "Bank Board") and the Federal Home Loan Bank of Atlanta ("FHLB–Atlanta"), and after FIRREA by the Office of Thrift Supervision ("OTS").

Citizens was a well-run, well-managed, and profitable institution. The thrift's philosophy was to be profitable in a prudent and innovative manner. As a fiduciary of other people's money, Citizens's management ran a very conservative institution. Mr. Stuzin achieved profitability by focusing on expenses. As a result of these efforts, Citizens's operating expenses were one of the lowest in its asset group and peer group. Similarly, Mr. Stuzin "was always looking to decrease the cost of capital if that was the prudent thing to do." Transcript of Proceedings, Citizens Federal Bank, F.S.B. v. United States, No. 92–656 C (Oct. 18–27, 2004) ("Trial Tr.") at 66.

For Citizens's management, "capital was king," a philosophy engrained into Mr. Stuzin by his father and maintained through an earlier recession and the twenty-one percent interest rates imposed by the Federal Reserve in 1981 and 1982. Mr. Stuzin ensured that Citizens maintained a capital cushion to protect against interest rate risk, capital risk, and what he characterized as onerous regulatory oversight. The capital cushion also allowed Citizens to take advantage of investment opportunities as they arose.

In 1986, Citizens was approached by the Government about acquiring Equitable Federal Savings and Loan of Lancaster, Ohio ("Equitable"), a failing thrift. Mr. Camner was responsible on behalf of Citizens for leading the negotiations in the Equitable acquisition, which took place in a series of meetings with the Government's representatives over a period of approximately six to nine months. Equitable was "severely negatively capitalized," "had no management structure consistent with what you consider

to be a proper concept," and had "investments that were extremely poor." Trial Tr. at 465. On the liability side, Equitable had overpaid for deposits, and its expenses exceeded acceptable levels. Mr. Camner, who participated in the due diligence preceding the acquisition, reviewed information from the Government relating to Equitable's portfolio, which revealed extremely ill-advised loans. The Government's Supervisory Memorandum that analyzed Equitable's condition on the eve of the merger confirmed Equitable's dire state.

The acquisition was considered risky for numerous reasons, including Equitable's negative capital base, its potential negative cash flow, its managerial problems, and the growing savings and loan crisis, which diminished customer confidence in the thrifts. In view of the concerns as to the riskiness of the acquisition, as well as Citizens's historical capital position, when negotiating, Mr. Camner tried to get at least an eight percent ratio of regulatory capital to total assets so that the institution could be well-capitalized from a regulatory viewpoint. Mr. Camner conveyed to the Government Citizens's viewpoint as to the need to maintain Citizens's capital position. Additionally, Mr. Stuzin informed the Government about his concerns for protecting Citizens's capital cushion, emphasizing that "at the end, Citizens had to have substantial capital in excess of the minimum requirements." Trial Tr. at 80–81. The Government shared the desire for a well-capitalized combined institution that would not end up being just another problem a year or two later.

The Government offered Citizens a special type of financing, specifically a Permanent Income Certificate, or PIC. The PIC was essentially a 100–year note that the Government and Citizens sought to qualify as a capital instrument. As a capital instrument, the PIC would count toward filling the hole created by Equitable's negative capital position, but because it was a form of debt financing, Citizens's interest payments to service the PIC would be tax-deductible. The "whole object was to create a tax-deductible situation." Trial Tr. at 473. Not only did Citizens convey that it considered the tax

deductibility to be a positive, but the parties were "mutually working to establish this instrument." Trial Tr. at 484. Ultimately, the Financial Accounting Standards Board rejected the parties' use of a PIC as capital, so the parties negotiated a different form of financing.

In order to preserve Citizens's regulatory capital position, Citizens received $35.9 million in supervisory goodwill, and the FSLIC purchased preferred stock from Citizens's parent company. The preferred stock had a below-market dividend rate to improve Citizens's cash flow and to account for the fact that payments on preferred would be paid out of after-tax income, imposing higher costs on Citizens. Despite the fact that the contract documents themselves did not make reference to Citizens's capital goal of eight percent, both parties fully understood the impact of the transaction on Citizens's capital level.

In December 1988, Citizens acquired American Savings Bank of Springfield, Illinois ("American"). By this time, Citizens had successfully completed the Equitable acquisition, and the Government was interested in having Citizens take over more insolvent institutions. The American negotiations, led by Mr. Camner for Citizens, took place over approximately three to six months. Citizens had many of the same concerns with respect to American, a "very sick institution," as it had with respect to Equitable. American had made poor commercial loans, leading to concern about the potential impact of the acquisition on Citizens. American was paying high rates on deposits and its operating expenses were too high. The Government shared this assessment of American. Given the concerns over American's condition, Mr. Camner once again "emphasized regulatory capital" in the negotiations, looking to the Government to "fill what was again a negative capitalization," and provide "capital loss protection with respect to assets." Trial Tr. at 487.

Mr. Camner went into the American negotiation with the intention of ensuring that the merger would leave Citizens with approximately eight percent regulatory capital. In response to its concerns, Citizens received an

approximately $86 million capital credit which was a surplus over $17 million in supervisory goodwill. The Government fully understood that Citizens intended to use the credit to capital and supervisory goodwill to sustain its capital cushion. Again, while the documents did not specifically mention eight percent regulatory capital, the Government understood that the effect of the American acquisition as negotiated by the parties was to provide Citizens with regulatory capital of approximately eight percent.

In June 1986, Citizens had a regulatory capital ratio of 5.9 percent. In December 1986, Citizens had a ratio of regulatory capital to total assets of 7.5 percent. In September 1988, Citizens had a regulatory capital ratio of 8.1 percent. In March 1989, Citizens had a regulatory capital ratio of 8.6 percent. Thus, Citizens had a higher capital ratio after each of the acquisitions than before.

## II. FIRREA

In August of 1989, Congress passed the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183. The statute, and its implementing regulations, was a "disaster" for Citizens, as it wiped out much of Citizens's capital, which fell from over eight percent to tangible capital of two percent. FIRREA established three new capital standards for insured depository institutions: "tangible capital," "core capital," and "risk-based capital," and restricted the ability of thrifts to use intangible assets (such as supervisory goodwill or credits to capital) toward these requirements. With respect to the tangible capital requirements, supervisory goodwill and credits to capital were immediately disallowed. As for the core and risk-based requirements, the OTS implementing regulations "phased-out" use of the relevant intangibles to satisfy such requirements over a five-year period, i.e., by December 31, 1994.

For Citizens, this meant that after FIRREA went into effect neither the credit to capital nor the supervisory goodwill for which it had bargained could count at all toward Citizens's tangible capital requirements. With respect to the new core and risk-based requirements, Citizens could phase out the supervisory goodwill and capital credit over a five-year period. As of March 31, 1990, Citizens's tangible capital was 2.16 percent, its core capital was 4.32 percent and its risk-based capital was 14.18 percent, which translated into a $30.2 million fully phased-in core capital shortfall. Trial Tr. at 98; PX 240 at 7. Although putting Citizens into current compliance, these capital levels were "not acceptable" to the Government. Trial Tr. at 99–100. For a thrift operating at these capital levels, and failing to meet a fully phased-in requirement, the regulatory environment was hostile at best. The entire industry was "under siege," including the regulators, who were under intense pressure to "crack down" on the regulated thrifts. Trial Tr. at 100. OTS was "tough in their examination," the regulators "were onerous in many of their decisions," and for institutions that did not meet OTS's requirements, they "had to sign supervisory agreements to come into compliance." Trial Tr. at 100.

## III. PRIOR PROCEEDINGS

In an Opinion dated February 20, 2002, the court held the Government liable for breaching the contracts entered into with plaintiffs, Citizens and CSF Holdings, for the acquisitions of Equitable and American. The Government breached those contracts when it enacted FIRREA and its implementing regulations, which no longer permitted Citizens to treat supervisory goodwill or capital credit as regulatory capital. *Citizens Federal Bank, FSB v. United States*, 51 Fed.Cl. 682 (2002) (*"Citizens I"*). In January 2004, on cross-motions for summary judgment regarding damages, the court held, in pertinent part, that: (1) plaintiffs were entitled to recover as expectancy damages the costs associated with the replacement of Citizens's supervisory goodwill and capital credit even though Citizens maintained a capital cushion and (2) plaintiffs were entitled to recover tax-related costs associated with Citizens's replacement of its supervisory goodwill through an exchange of non-cumulative preferred stock for subordinated notes. *Citizens Federal Bank, FSB v. United States*, 59 Fed.Cl. 507 (2004) (*"Citizens II"*). In *Citizens II*, the court

addressed the issue "whether the breach caused the exchange offer, and whether multiple causes for the exchange destroyed causation or otherwise preclude summary judgment on this issue of whether Citizens may pursue its claims for the costs of capital replacement." 59 Fed.Cl. at 514. The court held that the exchange offer was caused by the breach: "[T]he exchange was due in part to mitigate the effects of lost goodwill and capital credit. . . . the Court finds that multiple causes for the exchange are immaterial, that they do not destroy causation, and that the breach was a substantial factor for bringing about the exchange offer." *Id.* at 516. Thus, the trial was devoted to identification and quantification of the damages caused by the exchange offer and whether such damages were foreseeable and proven with reasonable certainty.

## IV. PLAINTIFFS' ALLEGED DAMAGES

Plaintiffs assert four categories of damages, totaling $30.5 million:

1. Transaction costs associated with the exchange offer, both in terms of the costs of issuing the preferred stock, as well as the costs associated with exchanging the subordinated debt, *i.e.*, a cash bonus to induce the subordinated debt holders to tender in 1990. Plaintiffs have quantified the amount of transaction costs as $3,802,901, which includes $1.609 million out of pocket expenses incurred in connection with the Series A, B, and C preferred stock, $121,901 out of pocket expenses incurred in connection with the Series D preferred stock, and $2.072 million of cash bonuses to induce note holders to accept the Series A and B preferred stock issuances. Defendant does not contest $1.731 million of the transaction costs.

2. Plaintiffs claim that Citizens incurred a loss, measured by the difference between the dividend rate paid on the preferred stock and the interest rate that it would have paid on the subordinated debt that was exchanged. Plaintiffs assert that the damages resulting

from the increased yield on the preferred stock amounted to $266,000.

3. The third element of loss claimed by plaintiffs is the lost income tax deduction for interest payments. Dividend payments on preferred stock are not a tax deductible expense whereas interest payments on subordinated debt are. The impact of the lost tax deductibility of interest arising from the exchange offer is calculated by plaintiffs to be $14.615 million.

4. Fourth, at the time of its sale to NationsBank in 1995, Citizens "was a different institution because of the exchange offer. Instead of having the sub debt outstanding, it had preferred stock outstanding." Plaintiffs attempted to measure the tax-related impact of the exchange on Citizens's value as an enterprise in 1995. The impact of the exchange, according to plaintiffs, was to reduce Citizens's enterprise value by $11.8 million.

Trial Tr. at 591–93; Plaintiffs' Post–Trial Brief 27–28.

## *DISCUSSION*

## I. PLAINTIFFS' MITIGATION WAS REASONABLE, AND DEFENDANT IS LEGALLY BARRED FROM CRITICIZING IT FIFTEEN YEARS AFTER THE FACT

The Government argues that it should not have to pay for most of the costs of the exchange because Citizens's chosen mode of mitigation was unreasonable, and plaintiffs failed to take into account the benefits they realized from the exchange. However, the evidence presented at trial clearly established that Mr. Stuzin and Citizens's management stayed true to form and acted reasonably when mitigating the effects of the Government's breach. After careful deliberation, Citizens embarked upon a conservative, cost-effective exchange offer.

### A. *The Applicable Legal Standard*

As this court held, "Citizens had a duty to mitigate its damages with reasonable efforts." *Citizens II*, 59 Fed.Cl. at 520 (citing

RESTATEMENT (SECOND) OF CONTRACTS § 350; *Robinson v. United States,* 305 F.3d 1330, 1333 (Fed.Cir.2002)). The centerpiece of the Government's defense is its hypothetical mitigation transaction that it now claims plaintiffs should have undertaken. *See* DX 775, Kroszner Expert Report. It is a bedrock principle of mitigation of damages, however, that even where the plaintiff bears the burden of mitigation, such Monday-morning quarterbacking is irrelevant to an award of mitigation costs. *See, e.g.,* E. ALLAN FARNSWORTH, CONTRACTS § 12.12 (3d ed. 1999) ("[A] party that takes steps that seemed reasonable at the time will not be judged by hindsight.").[1] As the Third Circuit explained in *In re Kellett Aircraft Corp.:*

> Whether or not the buyer's obligation to mitigate damages has been discharged depends on the reasonableness of its conduct. In this connection, reasonable conduct is to be determined from all the facts and circumstances of each case, and must be judged in the light of one viewing the situation at the time the problem was presented. Where a choice has been required between two reasonable courses, the person whose wrong forced the choice can not complain that one rather than the other was chosen.

186 F.2d 197, 198 (3d Cir.1950) (footnotes omitted).

Consistent with this fundamental principle of mitigation damages, this court has repeatedly rejected attempts by the Government to come in years after the fact and claim that the nonbreaching parties failed to mitigate properly. In *Commercial Federal Bank, F.S.B. v. United States,* the Government opposed lost profits damages on the ground that the plaintiff made no effort to mitigate the purported harm. 59 Fed.Cl. 338, 355 (2004). Defendant argued that plaintiff should have converted to a stock chartered institution as a means of mitigation. *Id.* Rejecting that argument, the court recognized, "[i]n fact, the shrink strategy employed by plaintiff was a form of mitigation. Management chose to shrink the institution in order to safeguard the thrift against new risks of failure created by the FIRREA-induced loss of capital." *Id.* Critically, the court explained, "[i]t is not the task of the court to second guess the judgment of a skilled team of managers with a history of successful institutional management." *Id.* As Judge Bruggink held in *First Nationwide Bank v. United States,* " '[t]he rule of mitigation of damages may not be invoked by a contract breaker ... merely for showing that the injured person *might have* taken steps which ... would have been more advantageous to the defaulter.' " 56 Fed.Cl. 438, 444 (2003) (quoting *In re Kellett Aircraft Corp.,* 186 F.2d at 198–99) (alterations in original). This general rule applies with particular force in the instant case where the breaching party had the ability to refuse to allow the injured party to deviate from its preferred course of mitigation.

1. *Fisher v. First Stamford Bank & Trust Co.,* 751 F.2d 519, 524 (2d Cir.1984) ("Hindsight may not serve as a basis to decrease damages plaintiff is otherwise entitled to recover."); *S.J. Groves & Sons Co. v. Warner Co.,* 576 F.2d 524, 528 (3d Cir.1978) (" 'it is immaterial that hindsight may later prove that the method of cover used was not the cheapest or most effective.' ") (citation omitted); *Beckman Cotton Co. v. First Nat'l Bank,* 666 F.2d 181, 184 (5th Cir.1982) ("What is commercially reasonable 'is to be determined from all the facts and circumstances of each case, and must be judged in the light of one viewing the situation at the time the problem was presented.' ") (citation omitted); *Veranda Beach Club Ltd. P'ship v. Western Sur. Co.,* 936 F.2d 1364, 1386 (1st Cir.1991) ("A party charged with mitigating damages is not obliged to play the seer, choosing the course of action that would, in hindsight, have turned out best."). RESTATEMENT (SECOND) OF CONTRACTS § 350, cmt. h (1981) ("Under the rule stated in § 347, costs incurred in a reasonable but unsuccessful effort to avoid loss are recoverable as incidental losses.") *Id.* at illus. 21 ("A contracts to sell B a used machine to be delivered at A's factory by June 1 for $10,000. A breaks the contract by repudiating it on May 1. B makes a reasonable purchase of a similar machine for $12,000 in time to be delivered at his factory by June 1. It later appears that, unknown to B, a similar machine could have been found for only $11,000. Nevertheless, B can recover $2,000 from A."); DAN B. DOBBS, LAW OF REMEDIES § 3.9, at 380, 383 (West 2d ed. 1993) ("The plaintiff is entitled to recover the reasonable costs of minimizing damages ... whether or not the damages were successfully avoided or minimized." And "[t]he key requirement is reasonableness. So the recovery for reasonable costs is appropriate, even if the effort to minimize was not successful and even if the costs incurred outran the savings.").

■ There are two other legal barriers to acceptance of the Government's argument. First, the law does not require a party to mitigate in a way that requires continued dealing with the breaching party. *See Koby v. United States*, 53 Fed.Cl. 493, 497 (2002) ("Accordingly, courts have been reluctant to require parties, under the duty to mitigate, to deal further with the breaching party....") (citations omitted); *Cain v. Grosshans & Petersen, Inc.*, 196 Kan. 497, 413 P.2d 98, 102 (1966) ("[A]n innocent party is not [automatically] required to execute a less advantageous contract with one who has already welshed on his agreement").

■ Second, the Government's argument that CSF Holdings should have offered to exchange its subordinated debt for that of Citizens, in spite of the significant regulatory risk that Citizens would be unable to declare dividends to service the debt, directly contravenes another bedrock principle of mitigation damages: plaintiffs are not required to undertake measures that would entail a risk of further economic damage. 5 CORBIN ON CONTRACTS § 1042, at 264 (1964) ("The plaintiff is not required to run the risk of increasing his loss."); *In re Kellett Aircraft Corp.*, 186 F.2d at 199 ("One is not obligated to exalt the interests of the defaulter to his own probable detriment."); RESTATEMENT (SECOND) OF CONTRACTS § 350 cmt. g (1981) (no need for nonbreaching party to assume undue risk). "[T]he rules of mitigation do not require the nonbreaching party to subject itself to the risk of additional losses. This is especially true in the context of a highly fluid, unpredictable business sector such as the savings and loan/banking industry in the midst of a crisis and revolutionary new Federal regulations." *S. Cal. Fed. Sav. & Loan Ass'n v. United States*, 57 Fed.Cl. 598, 640 (2003) (internal citation omitted).

## B. *Citizens's Mitigation Efforts Were Reasonable*

■ Under any understanding of the applicable standard, Citizens's mitigation efforts were reasonable. The testimony demonstrated that Citizens raised its replacement capital only after consulting with leading investment firms and carefully considering a wide range of options. At the conclusion of this deliberative process, Citizens's management settled on a strategy that was far less expensive than any open market transaction that could have been effectuated.

### 1. *Citizens Needed to Raise Capital After the Breach*

FIRREA dealt Citizens a tremendous blow, eliminating from its regulatory capital more than $100 million in supervisory capital. *See Citizens II*, 59 Fed.Cl. at 516. After the breach, Citizens fell out of compliance with its fully phased-in core capital requirement, and immediately became subject to a hostile regulatory environment, notably marked by the OTS's decision to deny Citizens the ability to upstream dividends to its parent. Mr. Stuzin personally went to the OTS Regional Office in Atlanta in early 1990 to request permission to pay dividends, based on Citizens's long history as a safe and well-managed institution that met its current minimum capital requirements. Jack Ryan, the principal supervisory agent, denied that request, simply stating, "[n]o, not until you're fully phased-in." Trial Tr. at 124. Mr. Ryan could not have been clearer in his conversation with Mr. Stuzin—Citizens had to come into compliance with its fully phased-in capital requirements, or it would be subject to restrictions such as a prohibition on issuing dividends. With the regulatory position firmly established, and based on his long and successful maintenance of a well-capitalized thrift, Mr. Stuzin concluded that it was "absolutely necessary" to raise capital. The Government agreed:

Subject institution currently meets the minimum regulatory capital requirements for savings associations which became effective 12–7–89. Bank's Tangible Capital as of 12–31–89 equaled 2.01%; Core Capital equaled 4.19% and Risked–Based Capital equaled 14.27%. However, Core and Risked–Based Capital calculations included $63,199M in regulatory goodwill and $19,181M in other qualifying intangibles. A program for replacement of this portion of the institutions [sic] capital base is essen-

tial for it to maintain capital ratios at regulatory levels.

DX 387 (1990 FDIC Report of Examination).

The Government's only response is to make much of Mr. Stuzin's deposition, in which he stated that Citizens did not "replace" the supervisory goodwill. This statement cannot bear the weight the Government seeks to place on it. Of course, Mr. Stuzin did not "replace" the supervisory capital— whatever the availability of replacement supervisory capital before the breach, it was not available after the breach. That does not mean, however, that Citizens is not entitled to damages incurred in replacing the supervisory capital *with tangible capital.* This court has previously rejected this precise argument. In *Home Sav. of America, F.S.B. v. United States,* Judge Bruggink explained:

> Typically, replacement goods are the same as those promised under the contract. Plaintiffs did not have the option here, however, of replacing lost supervisory goodwill with an identical commodity. It could not simply go into the marketplace and buy supervisory goodwill. The only means available to Home Savings for replacement was tangible capital, raised in the market, or through the retention of earnings-the most business-efficient ways to produce the same net effect with respect to meeting regulatory requirements. A plaintiff may nevertheless claim the cost of cover, even where the replacement goods are "not identical with those involved but commercially usable as reasonable substitutes under the circumstances." FARNSWORTH ON CONTRACTS § 12.11 (2d ed.2001) (citing UCC 2–712 cmt. 2; Anderson, *The Cover Remedy,* 6 J.L. & COM. 155 (1986)). The fact that the substitute is either of "superior or inferior quality does not of itself preclude its being cover; any measurable difference in quality can be compensated for by a money allowance." *Id.*

57 Fed.Cl. 694, 723 (2003).

### 2. *The Mitigation Option Chosen Was Cost–Effective and the Most Feasible of the Options Considered*

By June of 1989, Citizens's management was aware that its contracts would be breached. Throughout the year, Mr. Stuzin had closely monitored the progress of the legislation—he visited Washington seventeen times during the year. Accordingly, Mr. Stuzin contacted Merrill Lynch in May or June of 1989 and asked that firm to solicit various investors that might be interested in acquiring the company. Merrill Lynch provided a detailed book about Citizens that it sent to approximately forty companies. Merrill Lynch received not one expression of interest from a potential acquirer. As Mr. Stuzin explained: "[A]ny prudent investor looking at the situation that existed and the paranoia . . . of late 1989, early [19]90 would have been very reluctant to acquire a thrift." Trial Tr. at 97.

Given the dearth of potential acquirers, Citizens also contacted Salomon Brothers for an analysis of what was potentially feasible in terms of the public markets for raising capital. One option was to issue CSF Holdings debt with warrants, which Salomon Brothers priced at approximately twenty percent, while cautioning that even at a rate of twenty percent, it might not be possible to sell the security. Professor James similarly concluded that the "costs of an open-market transaction involving debt and warrants would be upwards of twenty percent." Trial Tr. at 638–42, 822–26, PX 447. Assuming $1.6 million in transaction costs, and no refinancing, Citizens's cost of raising capital to replace the supervisory goodwill and capital credit eliminated by the breach in an open market transaction in the period immediately after the breach would have been $169.4 million. PX 447. Assuming $1.6 million in transaction costs, and a refinancing at a lower rate after five years, Citizens's cost of raising capital to replace the supervisory goodwill and capital credit eliminated by the breach in an open market transaction in the period immediately after the breach would have been $88.5 million.

Citizens also considered, and ultimately pursued, an asset shrink that raised its capital levels. For the last nine months of 1990, Citizens shrank its assets by 3.8 percent. PX 151; DX 408. Plaintiffs did not seek at trial to recover lost profits cause by the shrink. Thus, despite plaintiffs' request, the

Court declines to make any findings of fact regarding the lost profits resulting from the shrink.

Citizens also considered an exchange of its outstanding subordinated debt for preferred stock, which would increase capital under post-FIRREA regulations because preferred stock was considered to be tangible and core capital while subordinated debt was not. Citizens had sold its outstanding subordinated debt, just under $110 million worth, through its branches to its depositors. The exchange of Series A, B, and C preferred stock was completed in 1990 (the "1990 Exchange"), while the Series D offer was completed in 1991 (the "1991 Exchange") (collectively, the "Exchange"). Essentially, "Citizens proposed to its sub debt holders ... an exchange offer for their subordinated debt in the form of preferred stock, and ... they offered, they gave [holders of Citizens's subordinated debt] three options, which are referred to as option A, B, and C, which correspond to the series of preferred stock that would be issued under each one of those options." Trial Tr. at 596; see also PX 332. The options were as follows:

1. Series A preferred was an option to receive a 12 percent dividend rate and a cash bonus of 3 percent of the principal amount of the preferred in exchange for the subordinated debt.

2. Series B preferred was an option to receive a 10 percent dividend rate and 20 percent return of principal, and a cash bonus of 1 percent of the principal amount of the preferred in exchange for the subordinated debt.

3. Series C preferred was an option to receive an 8 percent dividend rate and 35 percent return of principal, in exchange for the subordinated debt.

Id. The majority of noteholders agreed to exchange, and most noteholders selected the Series A. Specifically, Citizens issued $68.451 million of Series A, $1.824 million of Series B, and $3.554 million of Series C. Trial Tr. at 598–99, 807–10; DX 711; PX 471. The weighted average cost of the preferred A through C was 11.76 percent. DX 716; PX 471. As a result of the 1990 Exchange, Citizens was able to increase its core and tangible capital.

In May of 1991, Citizens offered Series D preferred at 12 percent yield in exchange for subordinated debt, issuing 173,386 shares of the Series D, at a total value issued of $4.335 million. Citizens also redeemed a portion of the outstanding subordinated debt at a 60 preferred/40 cash rate as part of the 1991 Exchange. After the 1991 Exchange, the weighted average yield on the preferred was 11.77 percent; there were 3.126 million shares outstanding, with a value of $78,164,000. PX 471. After the issuance of preferred stock in 1990 and 1991, Citizens paid dividends on the preferred stock every quarter, never missing a payment. Later in 1991, Citizens issued $25 million of Series E preferred at 10 percent. The Series E was sold through the branch network. The Series E was not part of an exchange.

The 1990 FDIC Report of Examination noted the various options that Citizens was considering to raise capital:

Chairman Stuzin stated that management will develop a program for increasing capital within the next six to twelve months. This program will most likely include some form of non-cumulative [sic] preferred stock in exchange for subordinated debt. Additionally, sale of common stock, or even some financing at the holding company level, with funds downstreamed into the bank, will be considered. Mr. Stuzin further stated that capital would be increased through earnings retention, with the payments of cash dividends being reduced in 1990, as needed.

DX 387. Although Mr. Stuzin discussed the need to raise capital and the potential methods for doing so with the examiners, the examiners did not express a preference as to which method Mr. Stuzin employed. The 1990 FDIC Report of Examination does not reflect any supervisory concern with a plan to exchange subordinated debt for preferred stock.

### 3. Professor Kroszner's Alternative Transaction Was Not Feasible

The Government contends that it should not have to pay for most of the costs of the

Exchange because Citizens could have entered into an alternative transaction that would have been less expensive than the Exchange and would have avoided the tax consequences of exchanging preferred stock for subordinated debt.

### a. The Alternative Transaction

Under the alternative transaction proposed by the Government, CSF Holdings would have exchanged holding company debt for Citizens's outstanding debt, thus moving the debt off Citizens's balance sheet and onto CSF Holdings's balance sheet. DX 775 at 4 (Kroszner Expert Report). With no support for the proposition that CSF Holdings itself could have issued over $100 million in subordinated debt,[2] Professor Kroszner attempted to rely on issuances by two well-capitalized industry giants, Golden West and Ahmanson, and the exchange documented in *Bank United of Texas, F.S.B. v. United States*, 50 Fed. Cl. 645 (2001), *rev'd*, 80 Fed.Appx. 663 (Fed. Cir.2003), for support. Professor Kroszner explained the alternative transaction by reference to a transaction entered into by Bank United: "[T]he parent, USAT holdings, issued senior notes in exchange for USAT's subordinated debt, that is the bank's subordinated debt, the sub-subordinated debt [sic], and then effectively infused the subordinated debt and subordinated notes as equity into the bank." Trial Tr. at 943. Professor Kroszner further stated that the Bank United transaction was "a concrete example of the particular transaction I have in mind." Trial Tr. at 1029.

But Professor Kroszner did not "know the identities of the individuals or institutions" to whom Bank United's parent had issued its debt. Trial Tr. at 1030. None of those thrifts were regulated by the Atlanta Regional Office of OTS and Mr. Ryan. There is no evidence in the record that the financial condition of either Golden West or Ahmanson was remotely comparable to that of CSF Holdings; instead, the evidence was to the contrary. Judge Turner specifically found that Bank United was "uniquely capable of

calling in capital commitments in large amounts on short notice." *Bank United*, 50 Fed.Cl. at 656; Trial Tr. at 1030. The thrift, Bank United, was owned by USAT Holdings, Inc., which in turn was owned by Hyperion Holdings Inc., which was owned by Hyperion Partners L.P. When Hyperion Partners was formed, the limited partners committed $430 million, of which approximately $370 million remained after Bank United was capitalized at the time of the supervisory acquisition. In this case, however, CSF Holdings was the sole parent company, and had as its principal earning asset Citizens itself.

Furthermore, although Professor Kroszner opined that the holding company would be able to issue subordinated debt at approximately the same rate as Citizens, he had no idea what that rate of return would be. *Compare* DX 775 at 5–6 *with* Trial Tr. 1039–40. As for Professor Kroszner's invocation of a CSF Holdings debt exchange in 1991, that transaction has no bearing on Citizens's views of the feasibility of adding large amounts of *additional* debt to the parent company. In 1991, "the owners of $12.4 million of subordinated bonds previously issued by Citizens Savings Financial Corporation [which later changed its name to CSF Holdings, Inc.] exchanged their bonds for an equal amount of newly issued CSF Holdings, Inc. subordinated notes." PX 231 at 6. As Mr. Stuzin explained, the holding company "gave notes to extend maturities" on outstanding notes, to give the company "more flexibility to have longer-term debt." Trial Tr. at 247; PX 231 at 21. Thus, the transaction did not add *any* debt to the parent company. But Professor Kroszner's alternative proposal, that the holding company issue almost *ten times* that amount of subordinated debt, was not viewed as feasible by Citizens's management for the reasons set forth below.

### b. The Regulators Generally Disfavored Subordinated Debt at the Parent Company Level

In order for Citizens to have effectuated Professor Kroszner's hypothetical transac-

---

2. This is the approximate amount of subordinated debt that Citizens had outstanding at the time

of the breach.

tion, the thrift would have been required to upstream dividends to the holding company to support the debt. This pressure on the insured entity would have been anathema to the Government regulators and to their view that holding companies should be a source of strength to their Government-insured subsidiaries.

The record is clear that the OTS sought to ensure that Citizens's parent was a source of strength. Professor Kroszner explicitly agreed that "thrift parent companies [are] supposed to be a source of strength to their subsidiaries." Trial Tr. at 1037–38; 1120–21. The OTS examined holding companies from the point of view of the insured institution, and measured whether the holding company could be considered a "source of strength." The OTS believed that the holding company "should not be a detriment to the thrift," which it would be if it pressured a thrift to upstream dividends to its detriment. Trial Tr. at 1204–05. As the reports of examination reflect, OTS in fact monitored the debt to capital ratio of the holding company, as well as the need to upstream dividends to service holding company debt.

As Mr. Camner testified, "the savings and loan system of regulators are very adverse to and have always been very adverse to having debt in holding companies." Trial Tr. at 496. "[S]ub debt in the holding company is an extremely difficult problem" because "you have to support it with dividends." Trial Tr. at 496, 522. Mr. Ryan personally indicated to Mr. Camner that he viewed the notion of subordinated debt at the holding company level very negatively. Trial Tr. at 497, 543. Mr. Ryan and the Atlanta district, which is one of the more conservative districts, has its "own little ratios they try to keep." Trial Tr. at 542–43. So "the notion of having a 2 percent equity capital holding company filled ... with a huge amount of debt would be totally anathema to the regulators." Trial Tr. at 542–43. By contrast, attitudes toward a "well capitalized" holding company, or giants in the more liberal California district, might have been slightly more favorable. Although there was no explicit statutory prohibition on holding company debt, there are "tremendous impediments" to it. Trial Tr. at

521. Citizens's understanding of the regulators' view of parent company debt was reason alone to reject this solution to its capital needs.

The OTS was not alone among Government regulators in disfavoring parent company debt. Had Citizens been a bank governed by the Federal Reserve, it would not have been allowed to pursue this transaction because "it wouldn't have been a safe and sound banking practice." Trial Tr. at 784. Professor Kroszner purported to give an expert opinion as to whether there would have been any regulatory approval or obstacle to parent company issuance of over $100 million in subordinated debt, to be funded by the insured institution, but he was unable even to identify which agency after FIRREA would have had authority over this transaction. Even after clarifying that he was familiar with the OTS, Professor Kroszner's opinion on the regulators' attitude toward parent company debt is, in the Court's view, entitled to very little weight in light of his limited understanding of the regulatory structure and atmosphere to which Citizens was subject:

- "I don't recall the specifics of the structure [of OTS]"
- "I don't know which particular geographic office [regulated Citizens]."
- "I do not" "know who the head of OTS Atlanta was at the time of the exchanges."
- And what position Mr. Ryan holds today: "I don't know. I know some people named 'Ryan' who could be this person...."
- "I don't know his personal opinion on parent company debt."
- "I'm unfamiliar with his approval process."

Trial Tr. at 1025–26.

### c. Uncertainty Clouded Citizens's Ability to Upstream Dividends

Citizens also declined to add parent company debt because of the risk that the Government would unreasonably withhold approval for its payment of dividends to CSF Holdings and thereby trigger a default on the parent's debt obligations. While the

same restrictions that applied to the issuance of dividends by Citizens to CSF Holdings applied to any dividend payments by Citizens on its preferred stock, Trial Tr. at 222; PX 332 at 8–9, and any dividend payments by Citizens on its preferred stock were subject to a Regulatory Capital Maintenance Agreement ("RCMA"), Trial Tr. at 206, failure to pay dividends on preferred stock would not result in default. At the time of the Exchange, Citizens had ample basis to be concerned that the Government would act unreasonably in considering its request to pay dividends. The Government offered a series of inconsistent and unreasonable standards that governed the approval process. And in denying Citizens's request to pay dividends in 1990, the Government turned its back on Citizens's decades-long track record of profitability and stability. It was reasonable for Citizens to have declined to put the company at the mercy of regulators who had acted inconsistently.

As part of the American acquisition, Citizens and CSF Holdings signed a RCMA. PX 314. Under the terms of the agreement, if Citizens was in compliance with its minimum capital requirements, it was entitled to pay fifty percent of its net income in dividends. If Citizens met the fully phased-in capital requirements, it could pay dividends of up to seventy-five percent of the net income for the fiscal year. If Citizens met its fully phased-in requirements plus two percent of liabilities, it could pay dividends of up to ninety percent of net income for the fiscal year. PX 314 at 12–13.

On February 9, 1990, Citizens filed dividend notification # 89–04, in which it proposed the payment of a cash dividend in the amount of $3,258,189.76 for the quarter ended September 30, 1989. PX 323. OTS documents reveal the inconsistent standards that governed the approval process relating to this dividend notification. On March 5, 1990, the conclusion with respect to this dividend notification was that "based on the terms of the [RCMA] Agreement" Citizens could pay $2.785 million in dividends. DX 856. This

memorandum was attached to another document, which was a letter addressed to Citizens's counsel, explaining that although OTS could allow a dividend of $2.785 million, OTS "must object" to the remainder of the proposed dividend because it was too high. DX 43. This letter was not sent to Citizens and bears the marking "not sent, revised to deny." *Id.* On March 9, 1990, the OTS did send a letter to Citizens's counsel objecting to dividend notification # 89–04. PX 323. But the letter does not refer to the RCMA, explaining instead that "[w]e note that Citizens does not meet the fully phased-in capital requirements pursuant to 12 C.F.R. Part 567. Accordingly, it is inappropriate for the institution to pay the $3,258,189.76 dividend." *Id.* Therefore, OTS "must object to the payment of the proposed dividend under the provisions of 12 C.F.R. Section 584.5." *Id.*

On March 1, 1990, Citizens filed a second dividend notification, # 89–05, this time seeking to pay a cash dividend of $2,743,897 for the quarter ended December 31, 1989. PX 325A. On March 19, 1990, OTS reviewed this dividend notification. OTS shifted its analysis and assessed the propriety of this dividend based once again on the RCMA, without reference to any CFR provision. DX 857. The supervisory analyst concluded that pursuant to the RCMA, Citizens could pay an additional $2.744 million if deferred dividends were included and $2.294 million if deferred dividends were not included. *Id.* The next day, March 20, 1990, however, the same supervisory analyst concluded, with respect to dividend notification # 89–05, that "although the dividend would be permissible under the Agreement, we believe that it is inappropriate for the institution to pay a dividend until such time as it meets its fully phased-in capital requirements." PX 325A. In a different memorandum also dated March 20, 1990, the analyst, adopting yet another standard, concluded that OTS "believe[s] that it is inappropriate for the institution to pay a dividend until such time as it meets its fully phased-in capital requirements, shows consistent earnings, and has no significant asset problems."[3] PX 324. This last memorandum reflects the

---

3. Unfortunately for Citizens, it was rated as having "significant concerns with the asset quality"

through the end of 1991. Trial Tr. at 1243–44.

confusion in the office regarding the criteria applicable to requests to permit payment of dividends—in the upper right hand corner the word "approve" is marked through and the word "deny" appears below it. *Id.*

Furthermore, even if Ms. Rankin or the supervisory analyst recommended approval, Mr. Ryan "could always add his knowledge and expertise to the process and make a decision that differed from our recommendation." Trial Tr. at 1228. In early 1990, Mr. Stuzin met with Mr. Ryan in Atlanta and requested approval to pay dividends. Despite the fact that Citizens had a long track record of profitability and conservative management, Mr. Ryan refused to allow Citizens to make dividend payments until it was in compliance with fully phased-in capital requirements.

By 1992, OTS agreed to amend the RCMA to allow Citizens to pay dividends equal to 100 percent of net income if it met its fully phased-in capital requirements. But the OTS denied plaintiffs' request to be released from the RCMA altogether. In an internal memorandum analyzing this request, one regulator stated that "[i]t is quite unlikely that a denial recommendation of their request for release from the agreement could stand the harsh light of serious analysis, but I would love to give it a try." PX 383. Citizens did eventually secure release from the RCMA. But even upon securing release from the RCMA "it was never guaranteed that they could pay the percentage or the amount permitted by the regulation" because of the dividend notification process discussed above. Trial Tr. at 1158.

Professor Kroszner was apparently unaware of any of these restrictions or denials, testifying that the "holding company was able to service its debt payments due to the infusion of capital, the payment—not infusion of capital, the payment of dividends from Citizens up to the holding company. And so they were able to do that. There had been *no inability* for them to do that. . . ." Trial Tr. at 961 (emphasis added). He further testified in response to a question specifically

about Citizens inability to make dividend payments to its parent company prior to the 1990 Exchange, "I don't recall that there was such a restriction at that particular time." Trial Tr. at 1032. Professor Kroszner's lack of familiarity with the constraints on Citizens's ability to pay dividends renders his opinion on the feasibility of a parent company debt issuance unreliable.

From 1957 through 1996, Citizens never missed a dividend payment on its preferred stock. Tr. at 57. Fortunately for Citizens and despite the onerous oversight, after the issuances of its preferred stock, Citizens made each and every scheduled dividend payment on its Series A through D, Series 1993A, and Series H preferred stock. Since Citizens was able to pay the preferred stock dividends as planned, it would in hindsight have been able to upstream enough dividends to the parent company so it could service any outstanding debt at the holding company level. Trial Tr. at 217–18.

Critically, however, plaintiffs do not bear the burden of showing, that Mr. Ryan *actually* would have denied the payment of dividends to service debt issued by CSF Holdings, or that the proposal relating to holding company debt *actually* was adopted. Plaintiffs' burden is simple, and they carried it: Mr. Stuzin was reasonably concerned about the feasibility or desirability of issuing holding company debt at the time the transaction was considered. *See, e.g., Beckman Cotton Co. v. First Nat'l Bank,* 666 F.2d 181, 184 (5th Cir.1982) ("What is commercially reasonable 'is to be determined from all the facts and circumstances of each case, and must be judged in the light of one viewing the situation at the time the problem was presented.'") (citation omitted).

### d. The Government's Responses Are Unavailing

The Government simply had no response to Citizens's reasoned decisionmaking. Professor Kroszner was unfamiliar with the facts of the case,[4] including the regulatory process

---

4. *Cf. Old Stone Corp. v. United States,* 63 Fed.Cl. 65, 81 n. 25 (2004) ("Dr. Cone's testimony was oddly vague and imprecise. His memory of the

expert report that he offered was limited. During his deposition, Dr. Cone did not know which regulatory agency was responsible for examining

and attitude toward subordinated debt, testifying that he was attending graduate school during the relevant time period. Ms. Rankin repeatedly emphasized that her testimony was based on her review of documents and she freely admitted that there could have been proposals of which she was unaware.

The simple reality is that Citizens was required to mitigate by the regulators. Specifically, the FDIC stated that:

Core and risk-based capital calculations included $63,199M in regulatory goodwill and $[19,181M] in other qualifying intangibles which will be phased out over a five year period [pursuant to FIRREA]. A program for replacement of this portion of the institution's capital base is essential for it to maintain capital ratios at regulatory levels.

DX 387.

As demonstrated at trial, the course of action selected by Citizens was reasonable, and was cost-effective given its available options at that time of crisis, such as an open market transaction. The Government cannot now be heard, fifteen years later, to second guess the decisions made by Citizens to mitigate the costs of the Government's own breach.

## II. MITIGATION OR "COVER" DAMAGES ARE AN APPROPRIATE REMEDY FOR THE GOVERNMENT'S BREACH

■ In *Citizens II*, the court held that, "as a matter of law, Citizens is entitled to prove its actual costs associated with its mitigation efforts." 59 Fed.Cl. at 519. "Expectation damages are recoverable provided they are actually foreseen or reasonably foreseeable, are caused by the breach of the promisor, and are proved with reasonable certainty." *Bluebonnet Sav. Bank F.S.B. v. United States*, 266 F.3d 1348, 1355 (Fed.Cir.2001) (citing RESTATEMENT (SECOND) OF CONTRACTS §§ 347, 351, 352 (1981)). In *Citizens II*, the court decided that the breach was a substantial factor in causing Citizens to exchange its subordinated debt for preferred stock. 59

Fed.Cl. at 519. At trial, seven days of testimony established that most of plaintiffs' damages, as calculated and explained by Professor James, were foreseeable and proved with reasonable certainty.

Plaintiffs seek the cost of replacing the regulatory capital eliminated by the breach, a remedy that is based on the concept of "cover," which is a form of expectancy damages. Expectancy damages serve to give the non-breaching party " 'the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed.' " *Bluebonnet*, 266 F.3d at 1355 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 344(a) (1981)). In *Citizens II*, the court found that Citizens "is entitled to the costs associated with the replacement of its supervisory goodwill and capital credit even though it maintained a capital cushion." 59 Fed.Cl. at 517 (relying on *Home Savings*, 57 Fed.Cl. at 721; *Bank United of Texas v. United States*, 50 Fed.Cl. 645, 665 (2001) (thrift awarded costs of raising capital "even when the money recovered ultimately went to replace its capital cushion.")).

Courts have consistently recognized that the cost of replacement capital is an appropriate measure of damages in the *Winstar* context. For example, in *LaSalle Talman Bank v. United States*, the Federal Circuit explained that "the cost of replacement capital can serve as a valid theory for measuring expectancy damages in the *Winstar* context because it provides a measure of compensation based on the cost of substituting real capital for the intangible capital held by plaintiff in the form of supervisory goodwill." 317 F.3d 1363, 1374 (Fed.Cir.2003) (quotation marks and citation omitted). *See also Citizens II*, 59 Fed.Cl. at 513–514; *Fifth Third Bank of W. Ohio v. United States*, 55 Fed.Cl. 223, 230 (2003). Where, as here, Citizens *actually* engaged in transactions to restore its capital positions, and *actually* incurred measurable costs in so doing, Citizens is entitled to recover those costs, provided the costs were " 'foreseeable under the circum-

---

federally chartered savings associations. 'I don't recall' and 'I would have to check' were frequent refrains throughout his deposition. He seemed

only slightly more familiar with this case on the stand." (citation omitted)).

stances'" and proven to a reasonable degree of certainty. *See Bluebonnet,* 266 F.3d at 1356 (citation omitted).

Under these well-established principles, Citizens is legally entitled to transaction (or "floatation") costs, including fees of lawyers and accountants, as well as other out of pocket expenses incurred in connection with the transaction. *See Citizens II,* 59 Fed.Cl. at 517. Trial testimony established that such transaction costs amounted to $3,802,901. Likewise, Citizens is entitled to the increased cost attributable to the difference between the dividend rate on the preferred stock and the interest rate on the subordinated debt, $266,000, as well as the diminished cash flow resulting from the adverse tax consequences of the Exchange, $14.615 million.

## III. THE EXCHANGE CAUSED MOST OF PLAINTIFFS' DAMAGES

The Government repeatedly argues that Citizens's decision to undertake the Exchange represented an intervening business choice, independent of the breach, and thus, that choice, and not the breach, caused plaintiffs' damages. As the Court stated at the pretrial conference, that argument is foreclosed by Chief Judge Damich's January 2004 Opinion. That is, Chief Judge Damich determined that the breach caused the Exchange. *Citizens II,* 59 Fed.Cl. at 516. At issue during the trial was whether plaintiffs' claimed damages were caused by the Exchange.

### A. *Transaction Costs Were Caused By the Exchange*

Citizens incurred transaction costs of $3,802,901 dollars as a result of the Exchange. In 1990, Citizens incurred issuance costs of non-cumulative preferred stock for the Series A, B, and C in the amount of $1.609 million. For the 1991 exchange of subordinated debt for Series D preferred stock, Citizens incurred issuance costs of $121,901. For the purposes of establishing damages, the Government does not contest these costs. Gov't Post–Trial Br. at 1.

The cash payments Citizens had to make to induce holders of the subordinated debt to exchange that debt for Series A and B preferred stock totaled $2.072 million. These cash bonuses were a cost that Citizens recognized and included in the offering circular as a "cost associated with the exchange." Trial Tr. at 634. Not only were the cash bonuses itemized in the securities filing, but as reflected in the offering circular, they were considered to raise the "effective yield of the preferred stock." Trial Tr. at 634–35; PX 332. The Government's expert, Professor Kroszner, appeared to take issue with Professor James's calculation of transaction costs generally, but the basis or strength of his objection was unclear.

### B. *Increased Dividend Payments Were Caused By the Exchange*

Similarly, the increased dividend payments were directly caused by the Exchange. Citizens incurred $266,000 in damages caused by the higher yield required on the preferred stock as compared to the subordinated debt. PX 461; Trial Tr. at 594–95, 605–06. Professor James calculated this amount by "taking the difference between the rate on the preferred and the rate on the debt that was exchanged and multiplying it by the amount that was exchanged over time." Trial. Tr. at 594–95. The subordinated debt had an average weighted interest cost of 11.65 percent. The average annual dividend rate was 11.76 percent in 1990 and 11.77 percent after the 1991 Exchange. Professor James calculated the impact of this increase in yield by analyzing the actual increased costs imposed on Citizens in 1990 through 1993. Trial Tr. at 604–05; PX 461.

The Government also hints that perhaps each decision to issue dividends to the holders of preferred stock, most of whom were also the thrift's depositors, was an independent business decision that precludes causation. The Federal Circuit's decision in *Bluebonnet* forecloses defendants' assertion that plaintiffs are precluded from recovering damages for dividend payments. 266 F.3d 1348. There, the Court ordered an award for $5.4 million in dividend payments. *Id.* at 1357. Similarly, the Federal Circuit in *LaSalle Talman Bank,* stressed that "it is well established that the payment of dividends is a

capital cost." *LaSalle Talman Bank,* 317 F.3d at 1375.

### C. *Loss of Interest Tax Shield Was Caused By the Exchange*

Citizens incurred $14.615 million in damages from the loss of its "interest tax shield," *i.e.,* "the loss of tax deductibility of interest payments." Trial Tr. at 595; PX 460. The loss of the interest tax shield, which costs were incurred from 1991–95, flowed directly from the Exchange. It is common ground that "payments on debt, whether it's subordinated or not, are deductible for income taxes, whereas payments on preferred stock are not." Trial Tr. at 113; 177. As Professor Kroszner confirmed, "[t]his difference in tax treatment has been well known for many years. It's a standard part of every—of every corporate finance or investment textbook that is out there, standard part of every MBA class, and I think something that every chief financial officer does know." Trial Tr. at 949.

### D. *Plaintiffs Have Not Proven That the Exchange Caused a Loss of Enterprise Value*

■ On June 19, 1995, Ken Lewis, then president of NationsBank approached Mr. Stuzin about acquiring Citizens. Mr. Stuzin initially told Mr. Lewis that he had no interest in selling Citizens. Despite that, Mr. Stuzin proceeded with negotiations, did his own analysis and "hired Alex Brown to make an analysis for [him] prior to meeting with Mr. Lewis." Trial Tr. at 141. On June 22, 1995, Mr. Stuzin received a phone call from Mr. Lewis as a result of which they arranged to meet on June 27, 1995, and, at that meeting, Mr. Lewis extended NationsBank's offer to acquire all of CSF Holdings's outstanding shares of stock and options for $516 million in cash or $39.50 per share of common stock. Trial Tr. 256; PX 435. There were only eight days between the time that Mr. Stuzin received the first, unsolicited phone call from Mr. Lewis on June 19, 1995, and the June 27 meeting when he came to an agreement on selling CSF Holdings to NationsBank for $516 million. It was at the June 27 meeting that Mr. Stuzin first learned that Nations-Bank was willing to pay $516 million for CSF Holdings. The June 27, 1995, meeting encompassed four to five hours of negotiations. The only two individuals involved in direct negotiations on behalf of the two entities were Mr. Stuzin and Mr. Lewis. During the negotiations, Mr. Stuzin was not invited to participate in discussions between Mr. Lewis and his staff.

Mr. Stuzin informed the board of CSF Holdings of NationsBank's offer on June 28, 1995. The engagement letter with Alex Brown is dated June 27, 1995, and the board of CSF Holdings did not have the results of Alex Brown's analysis at its meeting of June 28, 1995. The preliminary analysis discussed at CSF Holdings's June 28, 1995 board meeting did not include a discounted cash flow generated by the management of Citizens or CSF Holdings. At CSF Holdings's July 3, 1995 board meeting, Alex Brown presented its analysis of the NationsBank offer. Alex Brown's analysis valued CSF Holdings's shares at $30 to $33, which was between $6.50 and $9.50 below the NationsBank offer. Trial Tr. at 278–83; DX 361 at 5–6.

On July 4, 1995, CSF Holdings entered into an agreement with NationsBank, whereby NationsBank agreed to acquire CSF Holdings from its shareholders, subject to certain conditions. The Merger Agreement provided that each outstanding share of CSF Holdings common stock would be converted into the right to receive $39.50 in cash and one non-transferable right to receive a pro rata share of fifty percent of the net cash recovery, if any, in plaintiffs' litigation against the United States. PX 435 at 7. The Merger Agreement provided that Nations-Bank would take actions to facilitate the merger of Citizens with and into a wholly-owned subsidiary of NationsBank and/or the conversion of Citizens's charter to a bank charter simultaneously with, or promptly following, the consummation of the merger.

Notwithstanding that there is no evidence in the record of how Mr. Lewis arrived at his $516 million valuation for CSF Holdings, Mr. Stuzin testified that the metrics that informed NationsBank's ultimate valuation of Citizens "were definitely after-tax cash flow, price earnings, book value, the preferred

stock and the cost of preferred stock outstanding, the prepayment of that preferred stock and how long it would have to be held on the books of the acquirer." Trial Tr. at 146. Mr. Stuzin never reviewed any written discounted cash flow analysis that may have been prepared by NationsBank. Mr. Stuzin did not know what discount rate NationsBank may have used in any discounted cash flow analysis it may have prepared. He did not know what capitalization rate NationsBank may have used, or over how many years NationsBank discounted the cash flow before calculating the residual or terminal value. Mr. Stuzin did not know what growth rate Nations Bank used. Trial Tr. 277. Mr. Stuzin did not know what hurdle rate, if any, the analysis used. *Id.* NationsBank was interested in acquiring CSF Holdings because it believed the merger would improve its deposit market share in the Miami market and maximize the consolidated resources of NationsBank. Trial Tr. 288–89; PX 435.

Plaintiffs did not offer sufficient evidence to establish how NationsBank arrived at its $516 million valuation for CSF Holdings. There is no adequate basis to determine whether NationsBank would have paid more to acquire CSF Holdings had its after tax cash flow not been diminished. Contrary to plaintiffs' argument, the evidence in the record suggests that NationsBank over-valued CSF Holdings. Plaintiffs' own valuation of CSF Holdings, through the firm of Alex Brown, valued CSF Holdings's shares at $30 to $33, which was between $6.50 and $9.50 below the NationsBank offer, Trial Tr. at 278–83; DX 361 at 5–6.

Having decided that the Exchange caused three of plaintiffs' four categories of damages, the Court must determine whether those remaining damages were foreseeable and whether plaintiffs have established the amount of such damages with reasonable certainty.

## IV. THE COSTS OF THE EXCHANGE WERE FORESEEABLE

### A. *The Applicable Legal Standard*

"Expectation damages are recoverable provided they are actually foreseen or reasonably foreseeable...." *Bluebonnet,* 266 F.3d at 1355 (citation omitted). As this court previously recognized, "payments on equity dividends are always paid out of after-tax dollars, and so it was foreseeable and knowable and a direct consequence of the fact of having to raise capital in the form of equity that there would be an economic cost associated with this." *Citizens II,* 59 Fed.Cl. at 520 (quotation marks and citation omitted); *cf. Bluebonnet,* 266 F.3d at 1356 (concluding that increased cost of financing foreseeable and recoverable). Generally, "tax consequences have been awarded as an element of damages when they are reasonably foreseeable and flow from the breach." *Citizens II,* 59 Fed.Cl. at 520 (citing *Alexsey v. Kelly,* 205 A.D.2d 650, 614 N.Y.S.2d 736 (1994); *Beggs v. Dougherty Overseas, Inc.,* 287 F.2d 80 (2d Cir.1961); *W.H. Walker v. Signal Companies, Inc.,* 84 Cal.App.3d 982, 149 Cal.Rptr. 119 (1978)). "[P]ayments on the return on dividends are a *cost* of capital to the bank and those costs may be attributable to the breach as long as they reflect the actual experience that dividends were paid out and the benefits of mitigation are accounted for." *Citizens II,* 59 Fed.Cl. at 521 (relying on *LaSalle,* 317 F.3d at 1375).

The Government seeks to evade this conclusion by urging the acceptance of an unsupported and all-but-impossible standard for foreseeability. Under the Government's test for foreseeability, mitigation damages are available only if the specific details of a mitigation transaction are foreseeable. This is not the law. In *United States v. Winstar Corp.,* the Supreme Court made clear that supervisory capital was the "essential" and "indispensable" consideration in the acquisition of insolvent thrifts such as those that Citizens acquired.[5] 518 U.S. 839, 116 S.Ct.

---

5. *See Winstar,* 518 U.S. at 849–50, 116 S.Ct. 2432. *See also id.* at 921, 116 S.Ct. 2432 (Scalia, J., concurring) ("[T]he *very subject* matter of these agreements, an essential part of the *quid pro quo,* was Government regulation; ... an aspect of the transactions that reasonably must be viewed as the *sine qua non* of their assent ...."); *Winstar Corp. v. United States,* 994 F.2d 797, 804 (Fed.Cir.1993) ("Supervisory goodwill was critical to all of these acquisitions.").

2432, 135 L.Ed.2d 964 (1996). The Supreme Court's conclusion is equally applicable here because undisputed testimony at trial confirmed that Citizens explicitly negotiated the terms of the contracts at issue to maintain its capital cushion.

In support of its artificially heightened standard, the Government has invoked *Landmark Land Co. v. United States,* 256 F.3d 1365 (Fed.Cir.2001). In *Landmark,* the breached contract required the plaintiff to contribute $20 million in assets to the acquired thrift; a year after the required contribution, plaintiff transferred *all* of its assets to the acquired thrift, for tax reasons. When the thrift failed, plaintiff lost its entire business. In its suit, Landmark sought reliance damages for the entire business, not just the required $20 million contribution. The Federal Circuit applied the familiar standard that "a plaintiff must prove that both the magnitude and type of damages were foreseeable" at the time of contracting. *Id.* at 1378. The court concluded that although the "issue of foreseeability is admittedly close in this case," the trial court's holding that it was not foreseeable that the plaintiff would lose its "entire business" was not "clearly erroneous." *Id.* at 1379.

The Federal Circuit's decision in *Landmark* actually supports Citizens's argument in this case: as demonstrated above, it was clearly foreseeable that Citizens would seek to replace the capital it bargained for, at a cost. Mr. Camner's testimony regarding the American and Equitable negotiations also established that not only was it foreseeable that Citizens would be damaged in the event of the breach, but that a loss specifically of the interest tax shield would carry with it a cost.

Likewise, in *Bluebonnet,* the Federal Circuit was even more specific, concluding that where a thrift must raise capital in response to the breach, the costs of mitigation are foreseeable.[6] 266 F.3d 1348. "The Government is not persuasive when it asserts that it was unforeseeable at the time of contract execution that the breach of the forbearances would lead to increased financing costs for

[plaintiffs]." *Id.* at 1355. Instead, it was "foreseeable that [plaintiffs] would be forced to find alternate means of financing" in the event the contract was breached. *Id.* at 1356. It was similarly "foreseeable that the heightened regulatory requirements and [the thrift's] risk of seizure due to failure to meet those requirements, would heighten the risk of investing in [the thrift] and thereby increase the cost of securing either debt or equity financing." *Id.*

As for the magnitude of damages, the evidence at trial established that Citizens mitigated in a cost-effective manner. Citizens seeks to recover 25.8 percent of the face amount of the supervisory capital that was eliminated by the breach. Citizens's damages claim is thus considerably lower than other damage awards that courts have deemed to be foreseeable in the *Winstar* context. *See e.g., Glendale Fed. Bank, F.S.B. v. United States,* 239 F.3d 1374, 1378 (Fed. Cir.2001) (awarding $381 million, or 71.1 percent of the $536 million of supervisory capital that FIRREA eliminated); *Commercial Fed. Bank, F.S.B. v. United States,* 59 Fed.Cl. 338, 342, 351 (2004) (awarding $5.6 million, or 60.9 percent, of the $9.2 million of supervisory capital that FIRREA eliminated); *Home Sav. of America, F.S.B. v. United States,* 57 Fed.Cl. 694, 701, 731 (2003) (awarding $134 million, or 33.3 percent, of the $402 million of supervisory capital eliminated by the breach).

## B. *Citizens Demonstrated that the Damages Incurred Were Foreseeable*

The evidence presented at trial proved that the costs of the Exchange were both reasonably foreseeable and actually foreseen. Mr. Stuzin testified that he always sought to maintain a comfortable capital cushion, and Citizens's financial statements attest to that philosophy. With respect to the Equitable transaction, Mr. Stuzin and Mr. Camner testified *without contradiction* that: (1) the capital cushion was a term of the negotiations; (2) Citizens conveyed the importance of maintaining the capital cushion to the Government regulators; (3) the Government ne-

---

**6.** As discussed *supra* at Part II, the fact that some of the capital that Citizens raised ultimately went to restoring its capital cushion does not alter this analysis.

gotiators were aware of *and shared* the desire for a healthy resultant thrift with a strong capital position; (4) the Government fully understood that Citizens intended the supervisory goodwill to count toward its regulatory capital requirements; and (5) the terms of the acquisition reflected the preservation of Citizens's capital cushion.

Mr. Camner also testified that Citizens originally attempted to negotiate a debt-like instrument, the PIC, precisely because the interest payments to service the debt would be tax deductible. When the FASB rejected the parties' arguments that the PIC could be counted as capital, the parties then agreed on FSLIC preferred stock, with below market dividend rates *precisely* to compensate for the loss of the tax deductibility of servicing payments.

The evidence with respect to the American transaction was equally compelling and equally uncontroverted: Mr. Camner's and Mr. Stuzin's testimony lead inexorably to the factual conclusions that: (1) the capital cushion was a term of the negotiations; (2) Citizens conveyed the importance of maintaining its capital cushion to the Government regulators; (3) the Government negotiators were aware of *and shared* the desire for a healthy resultant thrift with a strong capital position; (4) the Government fully understood that Citizens intended the supervisory goodwill and credit to capital to count toward its regulatory capital requirements; and (5) the terms of the acquisition reflected the preservation of Citizens's capital cushion.

The Government appears to dispute that Citizens's damages were foreseeable—but not through a witness, as the Government declined to call even a single witness involved in the negotiations. The Government did make the point that the phrase "eight percent capital cushion" does not appear in the contractual documents. However, as Mr. Camner testified without contradiction, the pro formas that the parties agreed upon and worked through together demonstrated precisely what the parties bargained for, including Citizens's bargained-for capital cushion, even though the term capital cushion did not appear in the contractual documents. And

each transaction *strengthened* Citizens's capital cushion.

Given that the agreed upon regulatory capital treatment was an extensively negotiated and essential term of the contract, the Government necessarily foresaw that the direct and inevitable result of its breach of contract would be the need for Citizens to replace its regulatory capital. And because the Government explicitly agreed to "assume the risk" of future changes in the treatment of regulatory capital and thus "to make good any losses arising from subsequent regulatory changes," *Winstar*, 518 U.S. at 889, 116 S.Ct. 2432, the Government is foreclosed from arguing that the "losses arising" from the breach were not foreseeable. In light of these realities, the court concluded that "it was foreseeable at the time of the contract that Citizens would have to replace the capital credit and goodwill in order to continue to be a self-sufficient institution." *Citizens II*, 59 Fed.Cl. at 520.

At the time of the breach, the FDIC agreed that Citizens would have to raise capital, given its failure to comply with the fully phased-in capital requirements. Similarly, the OTS imposed sanctions on Citizens, denying its requests to issue dividends, until Citizens improved its capital position. Thus, the Government cannot suggest that it was unforeseeable that Citizens would raise replacement capital and that there would be a cost to Citizens to raise such capital. Rather, the Government's argument boils down to the proposition that damages are unavailable because the specific details of the mechanism Citizens used to raise capital were not known at the time of contract formation. However, no standard of foreseeability requires that even where mitigation damages were foreseeable, plaintiffs are nonetheless barred from recovery because the precise details of mitigation were not foreseen at the time of contracting. *See* VI.A, *supra*. Additionally, the Government acknowledged that the loss of the interest tax shield was foreseeable, explaining that one need not "play the seer or have 20/20 hindsight in order to know that interest payments on debt were tax-deductible, whereas dividend payments on preferred were not." Trial Tr. at 949. It was

also foreseeable that subordinated debt and preferred stock instruments would have different yields and that it would be more costly to maintain capital with preferred stock than with subordinated debt.

The law of mitigation is clear that where, as here, plaintiffs bargained for the benefit of regulatory capital, and defendant was aware of the potential kind and magnitude of the costs to Citizens of the removal of that capital, then the damages are foreseeable. With that in mind—that the type and amount of mitigation damages were foreseeable—the Court rejects the Government's arguments to the contrary.

## V. PLAINTIFFS DEMONSTRATED THE COSTS OF THE EXCHANGE WITH REASONABLE CERTAINTY

### A. The Legal Standard

The evidence adduced at trial established that plaintiffs carried their burden of demonstrating the costs of the Exchange to a reasonable degree of certainty. "The ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision: 'It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation.'" *Bluebonnet,* 266 F.3d at 1355 (quoting *Elec. & Missile Facilities, Inc. v. United States,* 189 Ct.Cl. 237, 416 F.2d 1345, 1358 (1969) (internal quotation marks and citation omitted)). Where, as here, " 'a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery,' and the court's duty is to 'make a *fair and reasonable approximation* of the damages.'" *Id.* at 1356–57 (citing *Ace–Federal Reporters, Inc. v. Barram,* 226 F.3d 1329, 1333 (Fed.Cir.2000) (quoting *Locke v. United States,* 151 Ct.Cl. 262, 283 F.2d 521, 524 (1960))) (emphasis added). "[C]omplete certainty and mathematical precision is not necessary once the fact of damages has been established." *Peck Iron & Metal Co. v. United States,* 221 Ct.Cl. 37, 603 F.2d 171, 174 (1979). Here, there is ample evidence of harm resulting from the Exchange—indeed, the Government concedes

that Citizens is entitled to recover transaction costs of $1.73 million. Accordingly, plaintiffs need only adduce evidence sufficient to enable the Court to make a fair and reasonable approximation of their damages. *Bluebonnet,* 266 F.3d at 1355.

As set forth in detail below, plaintiffs met their burden of adducing evidence sufficient to enable this Court to make a fair and reasonable approximation of their damages, in this case $18.684 million. These recoverable damages fall into three discrete categories, as to each of which plaintiffs adduced sufficient evidence to permit a fair and reasonable approximation of the damages suffered. First, Citizens incurred transaction costs of $3.802 million; second, Citizens incurred damages of $266,000 due to the increased yield required on the preferred stock as compared to the interest payments on the subordinated debt; and third, the loss of the interest tax shield cost Citizens approximately $14.615 million from the time of the breach to the sale to NationsBank.

### B. Transaction Costs

Citizens demonstrated the transaction costs incurred with reasonable certainty, and there can be no doubt that plaintiffs are legally entitled to these transaction costs. *See Citizens II,* 59 Fed.Cl. at 517. The Government does not dispute $1.731 million in transaction costs from the 1990 and 1991 Exchanges. The evidence also demonstrated that the 1990 Exchange cost Citizens an additional $2.072 million in the form of cash incentives Citizens paid note holders in order to induce them to exchange the notes for lower priority preferred stock. In addition to the testimony from Mr. Hope and Professor James that the cash payments were a transaction cost, the contemporaneous documents reflect Citizens's treatment of the cash payments as a cost of the Exchange. The Offering Circular itself reflects Citizens's contemporaneous view of the cash payments as a cost of the Exchange. PX 332. In short, plaintiffs proved transaction costs of $3.802 million with reasonable certainty.

### C. The Increased Dividend Payments

Citizens's increased dividend payments on the preferred stock as compared to its inter-

est payments on the subordinated debt constitute a classic increased cost of financing, which plaintiffs are entitled to recover under Federal Circuit precedent. *See, e.g., Bluebonnet,* 266 F.3d at 1356 (reversing as clearly erroneous decision declining to award increased dividend payments of $5.4 million). The nature of plaintiffs' claim with respect to the $266,000 in increased payments is simple: the weighted average yield on the subordinated debt was between 11 and 12 basis points lower than the weighted average yield on the preferred stock issued in the Exchange. The Government does not contest that the weighted average yield on the preferred stock issued as part of the Exchange was 11.76 and 11.77 in 1990 and 1991, respectively. Nor does the Government contest that the weighted average yield on the subordinated debt that was replaced was 11.65 percent. Citizens is therefore entitled to the difference in yields.

The Government had two specific criticisms of this calculation: (1) Professor James incorrectly assumed that Citizens would have refinanced its outstanding subordinated debt in 1993 absent the Exchange and (2) Citizens retired some debt as a result of the Exchange and therefore did not have to pay dividends on that debt, and should have offset that savings against its claim. As a preliminary matter, the Court notes that Professor Kroszner is undoubtedly an accomplished scholar and teacher. However, his lack of familiarity with the specific facts of this case, as well as his willingness to give "expert" testimony in areas clearly outside his expertise, made him an unreliable witness.

1. *Professor James's Assumption that Citizens Would Have Refinanced Absent the Exchange Was Proper*

Professor Kroszner argued that Professor James ignored that fact that the total amount of preferred stock dividends declined in the period 1992–95 because Citizens refinanced the preferred stock, thereby reducing the dividend yield. Professor James justified his calculation by assuming that, had Citizens not entered into the Exchange, Citizens would have refinanced a like amount of the subordinated debt in 1993 and 1994. The Government contends that there is no basis for this assumption. The Government assumes that because in the real world, Citizens did not refinance $27 million worth of subordinated debt in 1993 or 1994, it would have engaged in no refinancing absent the Exchange. The Government is incorrect.

Because refinancing would "lower the cost of capital, lower the cost of expenses," Citizens decided to do so. Trial Tr. at 130. Citizens had a long history of refinancing when the opportunity presented itself in the market. For example, in 1985, Citizens made early repayment of $82 million in Federal Home Loan Bank advances, and in 1986 prepaid $63.268 million. Similarly, proceeds of the 1988 subordinated debt issuances were used to pay off prior debt at higher rates.

Consistent with this pattern of activity, in 1993, Citizens began the process of refinancing its $103 million of outstanding Series A–E, *see* PX 473, through the issuance of Series 1993A preferred stock. Citizens hired Raymond James and Advest, two respected investment bankers, to market the stock on a retail basis, but they were only able to sell approximately $25 million. Mr. Stuzin then turned to Smith Barney to take over and sell additional amounts of preferred stock. The investment banks sold the stock on a retail basis, selling through their branches to their customers. The three investment bankers sold approximately $59.5 million in Series 1993A stock.

Citizens used the proceeds from the offering to pay down the preferred stock that it had issued in the Exchange. Citizens refinanced the preferred stock because it was the highest cost capital. Citizens, however, was not satisfied with the amount of Series 1993A sold, because management had wanted to retire all the high-cost preferred stock. By the end of 1993, after the work of the investment firms, there was no demand for additional Citizens capital. Accordingly, Citizens turned to its existing preferred stockholders and offered its Series H preferred stock. Citizens was able to place only approximately $13 million of the preferred stock. PX 127 at 18. After these refinancings, the outstanding preferred had an aver-

age weighted yield of 8.72 percent. Citizens was able to retire the remainder of the preferred stock that had been issued in 1990 and 1991 after CSF Holdings made a cash infusion of $30.808 million to redeem the series A–E preferred stock.

In short, in 1993 and 1994, Citizens continued its practice of refinancing its highest cost capital when interest rates had fallen sufficiently to warrant the time and expense of refinancing. It is reasonable to assume that in the absence of the Exchange, Citizens would have engaged in precisely the same behavior, i.e., refinancing the most expensive capital outstanding. In the event that there had been no Exchange, at the beginning of 1993, when interest rates came down, Mr. Stuzin would have "done what any CEO ... who was properly managing an institution would have done, I would have refinanced the firm cost, which is done every day." Trial Tr. at 138. To the extent that Citizens had been successful in raising capital in the but-for world, Mr. Stuzin "would have made a decision to pay off the highest cost capital so that our profitability of our company could be increased. I think that would be human nature." Trial Tr. at 139.

Professor Kroszner declared that Professor James's assumption that "had Citizens not entered into the Exchange, Citizens would have refinanced a like amount of the subordinated debt in 1993 and 1994" was "speculative," apparently based on Professor Kroszner's understanding that Citizens "did not do a refinancing during this time period." Trial Tr. at 892. However, it is undisputed that Citizens did, in fact, refinance upward of $70 million in outstanding preferred stock in 1993 and 1994, i.e., $59.5 million of Series 1993A and $13 million of Series H. To be sure, by the end of the refinancings, Citizens did have a portion of subordinated debt remaining on its books. Professor Kroszner incorrectly argues from this fact that Citizens would have done no refinancing—none whatsoever—absent the Exchange. But Citizens did not refinance the remaining $27 million of subordinated debt because, as Mr. Stuzin testified, "who was going to refinance it for me? I'd gone to Advest, Raymond James, Smith Barney, and they only could

raise as much as they did. I couldn't get others to do so. And therefore, it would be extremely difficult to pay off that subordinated debt." Trial Tr. at 140.

Professor Kroszner reached a contrary conclusion only because he simply ignored basic facts about Citizens's real world financing, such as:

- Do you know what firm was hired? "*I don't recall. . . .*"
- Do you know how many were hired? "*I don't recall.*"
- Do you know why there were three underwriters? "*I do not know.*"
- Do you know whether Citizens wanted to sell more than $59.5 million of series 1993A preferred stock? "*I do not know.*"
- How was the series H sold? "*I don't recall. . . .*"

Trial Tr. at 969–71 (emphases added).

To support his contention that the market was not saturated, Professor Kroszner instead relied on information as to trading in CSF Holdings's *common stock.* However, issuing common stock would have been far more expensive than issuing debt. The price of CSF Holdings's common stock more than doubled in the two years from July of 1993 to the time the acquisition by NationsBank was announced in June 1995.

Likewise, Professor Kroszner's conclusion that no refinancing would have occurred absent the Exchange flowed from his lack of awareness of Citizens's history of refinancing its most expensive capital. He was once again unable to answer basic questions on that history:

- "*I did not specifically look* at refinancing in 1985."
- "*I don't recall* specifically looking at 1985 or 1986 independent of just looking generally at how the securities issuances were evolving."
- "*I don't recall* specifically '87 separate[ly]."
- "*I don't recall* specifically the transactions in 1988."

- *"I'm not certain* of [whether Citizens did refinancing in 1988]. And I don't want to say something that I'm not certain of."
- *"I don't recall* specifically what happened for the holding company in 1988 with respect to refinancing."
- "I certainly looked at the costs of different forms of securities that were outstanding, but *I can't recall specifically whether it was the most expensive ones that were then completely retired or not."*

Trial Tr. at 987–92 (emphases added).

Nor did Professor Kroszner make a specific calculation as to what the markets would have charged Citizens to issue subordinated debt in 1993, or a systematic analysis of what institutions comparable to Citizens were paying in 1993 on subordinated debt issuances. Professor Kroszner did not analyze particular numbers as to what incentives would have had to have been offered in 1993 to effectuate an exchange. At the time of trial, Professor Kroszner had not been retained by *any* financial institution to assess what its cost of capital would be. He has done "exercises that are similar to this on a simplified basis, but not for a real live financial institution." Trial Tr. at 1109.

### 2. *Professor James Was Not Required to Offset the Savings Realized by Retiring Debt During the Exchange*

Professor Kroszner also claimed that Citizens benefitted from retiring its subordinated debt in connection with the Series B, C, and D exchange offers. Specifically, Professor Kroszner contended that interest payments that Citizens saved by virtue of the retirement should be credited against the cost of the Exchange that Professor James quantified. Professor Kroszner has ignored the fact that retirement of the subordinated debt led to a reduction in Citizens's risk-based capital profile and thus simply required Citizens to raise even more capital. Citizens did just that in the months after the Series D exchange offer was completed in 1991. Shortly thereafter, Citizens announced that it would offer $25 million of Series E preferred stock with a yield of 10 percent. The Series E preferred stock was more ex-

pensive capital in after-tax dollars than the subordinated debt that it replaced for risk-based purposes because the ten percent yield was not tax deductible, while the 11.65 percent yield on the subordinated debt was tax deductible. Thus, there was no benefit to Citizens of retiring debt when the capital markets charged a higher rate of return on the new replacement capital.

### D. *The Loss of the Interest Tax Shield*

It is well-established that "tax consequences" are "an element of damages when they are reasonably foreseeable and flow from the breach." *Citizens II,* 59 Fed.Cl. at 520 (citations omitted). Accordingly, the court held that Citizens is entitled to damages sustained from the loss of its interest tax shield. *Id.* The evidence adduced at trial demonstrated the amount of such damages, $14.615 million, to a reasonable degree of certainty.

It is common ground among the parties that interest payments on subordinated debt are tax-deductible, but dividend payments on preferred stock are not. This simple proposition is at the heart of Citizens's damages claim. When Citizens exchanged subordinated debt for preferred stock, it lost the benefit of this interest tax shield. Plaintiffs now seek recovery of the damages that resulted from that loss.

As explained by Professor James at trial, in order to quantify the effects of the diminution in Citizens's after-tax cash flow during the period 1991–1995, there are four steps:

1. Identify the amount of subordinated debt that was exchanged.

2. Identify rate of interest on the subordinated debt.

3. Identify the applicable marginal tax rate for that year.

4. The product of those is the amount of reduced after-tax cash flow.

Trial Tr. at 612.

Professor James testified as to the appropriate balance of preferred stock for each year by using the lesser of the amount of subordinated debt exchanged or the remaining disallowed supervisory capital (which

amortized on a 25–year straightline basis). This conservative approach ensured Citizens was not overcompensated.

The Government did not offer any criticism of Professor James's assumption that the yield on the subordinated debt was 11.65 percent in 1991 and 1992. Here again, the Government argues that Citizens reaped a benefit from the Exchange. The Government argues that there would not have been a refinancing of subordinated debt in the absence of the Exchange and claims that Professor James ignored this benefit. We have already rejected this argument. *See* VII.C.1, *supra.*

Professor James applied the top federal marginal corporate tax rate, which was 34 percent in 1991 and 1992, and increased to 35 percent in 1993 and stayed at that level through 1995 when Citizens was acquired by NationsBank. Significantly, the Government's own expert witness, David Kennedy, utilized these same tax rates in attempting to quantify the value of net operating loss ("NOL") utilization in his first expert report. DX 153, Kennedy Expert Report, at 29. The applicable marginal state income tax rates for Florida were 1.76 for 1991, 1.88 percent for 1992, 1.3 percent for 1993, 1.49 percent for 1994, and 1.60 percent for 1995. PX 463. For the other states in which Citizens operated, the applicable tax rates were 1.58 percent for 1992, 4.25 percent, for 1993, and 0.76 percent for 1994. PX 464.

The evidence clearly demonstrated that Citizens was injured by the loss of the tax deductibility of interest payments on the subordinated debt in both 1991 and 1992 because in both years, Citizens used NOLs that would have been available in future years to shield income from federal and state taxation. As Professor Kroszner acknowledged, there are only two pieces of information necessary to verify this conclusion: the amount of NOLs utilized in each year and the amount of NOLs set to expire in each year. Although, when Professor Kroszner attempted to critique Mr. Hope and Professor James regarding the amount of NOLs that Citizens

had, used, and lost due to expiration in a given year, he was unable, using CSF Holdings's tax returns,[7] to perform the basic calculations to determine the amount of NOLs used by Citizens in a given year. Professor Kroszner's testimony on this issue was outside his expertise and incorrect. Accordingly, the Court has not relied upon that testimony.

For 1990, because Citizens had more NOLs expiring than it could use, Citizens "wouldn't have been able to enjoy the benefit of the lost interest tax shield in 1990." Trial Tr. at 619. In 1991, Citizens used NOLs of $33,185,485. In 1991, only $20,508,405 of NOLs were set to expire. Thus, Citizens utilized $12,676,080 worth of NOLs in 1991 that were not set to expire in that year, an amount that exceeds the tax deductions of $8.896 million that would have been available but for the Exchange. In 1992, Citizens used NOLs of $69,058,639. In 1992, only $15,803,463 of NOLs were set to expire. Thus, Citizens utilized $53,255,176 worth of NOLs in 1992 that were not set to expire in that year, an amount that exceeds the tax deductions of $9.106 million that would have been available but for the Exchange. Nothing in PX 489 is to the contrary. That exhibit includes only two relevant numbers: the amount of NOLs utilized for 1991 and 1992, which are reported as $21,239,494 and $33,185,485, respectively. Those numbers are identical to the numbers reported on the consolidated tax returns for those years.

In 1993, Citizens utilized its remaining NOLs and paid tax on $45.45 million of income. Absent the Exchange, in 1993 Citizens would have been able to utilize NOLs that it utilized in 1991 and 1992. As reflected in PX 462, Citizens was forced to utilize $8.896 million of NOLs in 1991, $9.106 million of NOLs in 1992, and $8.286 million of NOLs in 1993 because of the loss of the tax deductibility of interest payments on the subordinated debt that was exchanged. All of these NOLs, totaling $26.288 million, would have been available to shield income in 1993

---

**7.** CSF Holdings filed consolidated returns on behalf of itself and its subsidiaries, including Citizens.

and would have reduced taxable income in that amount.

In 1993, Citizens's actual marginal federal corporate income tax rate was 35 percent. Nevertheless, as a conservatism, Professor James calculated the cost of using NOLs in 1991 and 1992 by reference to the applicable corporate tax rate in effect for those years, 34 percent. Significantly, this is the approach that the Government's expert witness, David Kennedy, utilized in attempting to quantify the value of the NOL utilization in his first expert report. If Professor James had quantified the effect on Citizens's after-tax cash flow in 1993 resulting from the loss of the interest tax shield for federal income tax purposes by reference to a 35 percent marginal federal tax rate, then the resulting damages would have been increased by $180,000.00.

In 1994, Citizens had taxable income, taxed at the corporate rate of 35 percent. If it had subordinated debt rather than the preferred stock outstanding, it would have had a $6.498 million deduction, which translates into $2.274 million in after-tax cash flow. See PX 462, Trial Tr. at 795. Similarly, in 1995, Citizens had taxable income, taxed at the corporate rate of 35 percent. If it had subordinated debt rather than the preferred stock outstanding, it would have had a $6.125 million deduction, which translates into $2.144 million in after-tax income. Trial Tr. at 795.

The amount of alternative minimum tax paid by Citizens in 1991 and 1992 is irrelevant to the calculation of the net cost of the Exchange. Citizens paid alternative minimum tax in both 1991 and 1992. But it received a matching credit for the alternative minimum tax paid in those years and earlier years in 1993 and 1994. Thus, the alternative minimum tax had no meaningful economic impact on Citizens other than the time value of money associated with the realization of the credit.

The diminution in after tax cash flow due to the loss of tax deductibility for federal tax purposes of interest payments totaled $13.439 million dollars. Using similar calculations, but applying the applicable state tax rates, Professor James calculated the diminution in after-tax cash flow from state taxes to

be $1.176 million. Trial Tr. at 795. Thus, plaintiffs' lost after-tax cash flow as a result of the Exchange was $14.615 million. Trial Tr. at 796–97.

## VI. CITIZENS DID NOT REALIZE BENEFITS FROM THE EXCHANGE

■ The Government contends that Citizens recognized three major benefits from the Exchange, and that those benefits must be offset against plaintiffs' claimed damages. In *Citizens II,* the court stated "that as a matter of law, the benefits of mitigation must be credited to Defendant, as it contends." 59 Fed.Cl. at 526. This is so because "'the non-breaching party is not entitled, through an award of damages, to achieve a position superior to the one it would have reasonably occupied had the breach not occurred.'" *Id.* (quoting *La Salle,* 317 F.3d at 1372). Additionally, "the burden is on Citizens to consider the beneficial effects of mitigation in its damages calculation." *Id.* But "the measure of the benefit need not be precise." *Id.*

Specifically, defendant claims that Citizens benefitted from: (1) "financial flexibility" associated with preferred stock, (2) having refinanced its preferred stock in 1993 and 1994, and (3) retiring some of its debt in connection with the Exchange. On summary judgment, the court found that "there exists a factual dispute concerning the beneficial effects that the exchange offer may have provided Citizens." *Citizens II,* 59 Fed.Cl. at 526. The record after trial demonstrates, however, that Citizens did not in fact realize any of these benefits from the Exchange, so no offset is required.

### A. Citizens Did Not Realize Any Benefit From the Alleged Financial Flexibility of Preferred Stock

Professor Kroszner hypothesizes that Citizens realized a benefit from the financial flexibility associated with preferred stock. In essence, Professor Kroszner argued that Citizens could have missed a payment on its preferred stock without defaulting on its underlying obligations whereas the failure to make a payment on subordinated debt would

have triggered a default. The record is clear, however, that Citizens did not in fact recognize a financial benefit from this feature of the preferred stock issued as part of the Exchange. Citizens made each and every payment on its preferred stock. And it did so because skipping a payment was not a realistic or prudent business option. As Mr. Stuzin explained, preferred stock was held by Citizens's customers—its depositors—who had purchased the notes they exchanged in Citizens's branches. Mr. Stuzin explained that he "was dealing with my customers. I was dealing with my depositors. I wasn't dealing with the public at large, some entity not connected with the association. I was dealing with my depositors. I had a fiduciary responsibility, in my judgment, to make sure I made every payment." Trial Tr. at 118. Obviously, Citizens had no intention of antagonizing its customer base by skipping a payment on its preferred stock. Indeed, throughout its history, Citizens never missed a single principal payment to a depositor, a single interest payment to a depositor, a single interest payment on debt that it had issued, or a single payment on its preferred stock. This business philosophy worked very well for Citizens and it was able to gather deposits and maintain profitable relationships with its customer base.

Because of this economic reality, Citizens never placed any economic value on the ability to skip a dividend payment on preferred stock. Significantly, in the period prior to FIRREA when both subordinated debt and preferred stock counted toward regulatory capital requirements, Citizens consistently chose debt over preferred stock. For example, in 1988, Citizens issued $110 million of subordinated debt. Citizens chose to issue subordinated debt instead of preferred stock because not only could it be treated as capital, but because Citizens "could deduct the interest," which "went right to the bottom line." Trial Tr. at 117. And this debt was issued to refinance debt that Citizens had issued at an earlier date. Likewise, the holding company consistently chose to issue debt rather than preferred stock. Indeed, the only significant amount of preferred stock on Citizens's balance sheet in the period prior to FIRREA resulted from the Equitable acqui-

sition and the sale of preferred stock to the FSLIC. But as the negotiations over the PIC demonstrated, Citizens preferred debt over equity and only agreed to the sale of preferred when the FASB rejected its proposal to sell debt to the FSLIC. *See* PX 228 at ¶¶ 12–13.

Tellingly, Professor Kroszner was unable to point to a single dollar of cash flow that Citizens realized from the benefits of financial flexibility that he hypothesizes. He stated: " 'Specifically focusing on the financial flexibility? I don't have a particular number to point you to that would have increased or decreased their cash flow due to having this flexibility....' " Trial Tr. at 1017–18 (quoting Kroszner depo. at 142–43). Likewise, he was unable to point to a single decision that Citizens made after the Exchange because of the flexibility associated with preferred stock. As he testified, "I don't know whether they specifically used that flexibility for the purchase of a particular asset or another one." Trial Tr. at 1015. In short, Professor Kroszner was unable to point to any evidence suggesting that Citizens realized any benefits from the ability to skip payments to its customer base.

### B. *Citizens Did Not Realize Any Benefit Resulting from the Exchange in Connection With Its Refinancing Activity in 1993 and 1994*

Professor Kroszner also claimed that Citizens realized a benefit from the Exchange by virtue of its refinancing activity in 1993 and 1994. This argument was addressed and rejected earlier. *See* V.C.1, *supra.*

In addition, Citizens did not realize a benefit by virtue of issuing preferred stock at a weighted average of 8.72 percent as a result of the Series 1993A and H offerings. Professor Kroszner's testimony could be interpreted as suggesting that the yield on a comparable subordinated debt instrument would have been higher in 1993 and therefore Citizens realized the benefit. Professor Kroszner's criticism ignores the fact that subordinated debt is safer than preferred stock because it has a higher liquidation preference. Under basic principles of corporate finance, a safer capital instrument has a *lower* yield than a riskier capital instrument. Thus, it was in

fact conservative for Professor James to assume that the subordinated debt and preferred stock refinancings in 1993 and 1994 would have had the same rates. Moreover, Professor Kroszner's reliance upon the hypothetical tax advantages available to certain corporate purchasers of preferred stock is irrelevant to this analysis because Citizens's preferred stock refinancings were sold to retail customers. Specifically, Series H preferred stock was sold through Citizens's branch network to retail customers. Likewise, the investment banks sold the Series 1993 A preferred stock through their retail branches to retail customers, *i.e.*, individuals. Trial Tr. at 137, 698; PX 233 at 11.

### C. *Citizens Did Not Benefit By Retiring Its Subordinated Debt*

Professor Kroszner also claimed that Citizens benefitted from retiring its subordinated debt in connection with the Series B, C, and D exchange offers. This argument was addressed and rejected earlier. *See* V.C.2, *supra.* Additionally, the very structure of the Exchange provides further contemporaneous evidence that Citizens did not believe it benefitted from the retirement of subordinated debt. Specifically, Citizens encouraged note holders to accept the Series A by offering them the highest cash bonus and the highest yield of any of the options. The overwhelming majority of note holders accepted the Series A option. Significantly, the Series A preferred stock did not require any return of principal and thus did not require Citizens to redeem any of the subordinated debt. If Citizens had perceived a benefit in the retirement of debt, it would not have so effectively skewed the incentives toward acceptance of the Series A preferred stock.

### CONCLUSION

For the reasons set forth above, plaintiffs are entitled to damages in the amount of $18,683,901. The clerk is directed to enter judgment for plaintiffs in that amount.

IT IS SO ORDERED.